In the Matter of the Application of PAUL ERLANGER, Petitioner, Respondent, Appellant, against THE REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK and 'Others, Appellants, Respondents.*

In the Matter of the Application of JULIUS LEVI, Petitioner, Respondent, Appellant, against THE REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK and Others, Appellants, Respondents.*

Third Department, March 8, 1939.

* Revg. 169 Misc. 332.

*Mariash & McAuliffe* [*Irving Mariash* of counsel], for the petitioner.

*Ernest E. Cole* [*Charles A. Brind, Jr.,* of counsel], for the defendants.

HEFFERNAN, J. The appeals in these two proceedings involve the same questions, the causes were argued together and hence will be decided simultaneously.

In 1937 both petitioners passed an examination in English for foreigners and both applied for admission to the January, 1938, medical licensing examination. These requests were granted. In the case of petitioner Erlanger he received a passing mark in but two of the nine subjects in which he was examined. In the case of petitioner Levi he failed to receive a passing mark in a single subject. Erlanger was admitted to the September, 1938, examination and as a result he received a passing mark in four out of the nine subjects.

Subsequently to the January, 1938, examination both petitioners presented to the Board of Regents applications for the indorsement of their German medical licenses and on May 20, 1938, that body denied such applications " because the evidence submitted * * * is not satisfyingly sufficient to warrant such indorsement, but that such denial shall be without prejudice to the right of the applicants to continue taking the medical licensing examinations."

Both petitioners then applied to the court at Special Term for an order under article 78 of the Civil Practice Act to compel the Board of Regents to indorse their foreign medical licenses without requiring them to take medical examinations pursuant to the provisions of subdivision 3 of section 51 of the Education Law. They asserted that the Regents in denying their applications did not consider the evidence presented. That contention cannot be sustained. When they applied for permission to take the medical examination they submitted their credentials and were rated by the Department of Education for the purpose only of admission

to the examination as "four years of approved medical study." Neither their applications for the indorsement of their foreign licenses nor the supporting evidence was before the Regents at that time. These documents, however, were before the Regents when they made their decision on May twentieth denying the applications.

After hearing the parties the Special Term determined that questions of fact relating to the qualifications of petitioners were involved which should be tried at a Trial Term of the court. From that determination all parties have appealed to this court.

Whether the court at Special Term followed the proper procedure in taking jurisdiction of the issues presented or whether the matter should have been referred to this court in the first instance is not now of much importance. It is conceded that there is no triable issue of fact presented and no basis for the orders under review directing a trial of such issues. To uphold the ruling of the Special Term would mean a trial before the court either with or without a jury where either side would have the right to produce such evidence as it deemed relevant and material in order that it might be adjudicated whether or not the determination of the Regents should be sustained. That would result in a review of the decision of the Regents not on the evidence before that tribunal but on entirely new proof. There is no warrant in law for such procedure.

According to our view the sole issue before the court in these proceedings is whether or not the action of the Regents in denying petitioners' applications was arbitrary, unfair or capricious.

The pertinent provisions of subdivision 3 of section 51 of the Education Law, under which the petitioners are proceeding, are: "3. And the Regents shall have further power to indorse a license issued by a legally constituted board of examiners in any other State or country upon satisfactory evidence that the requirements for the issuance of such license were substantially the equivalent of the requirements in force in this State when such license was issued, and that the applicant has been in the lawful and reputable practice of his profession for a period of not less than five years prior to his making application for such indorsement. When the evidence presented is not satisfyingly sufficient to warrant the indorsement of such license, the Board of Regents may require that the candidate for indorsement shall pass such subjects of the licensing examination specified by statute or Regents' rule as should be required of the candidate to establish his worthiness to receive such indorsement."

The obvious purpose of the statute was to permit the Board of Regents to indorse a license issued by the licensing board of another

State or country in those cases in every profession in which the applicant is unable to meet the letter of the requirements of the statute governing admission to the profession in which a license is sought but possesses essentially the same or equivalent qualifications necessary for a license. The power herein granted is a limited one, remedial in its nature, and must be exercised by the Regents with caution and with due regard to the statutes regulating the practice of medicine in this State. Certainly the Regents may not through the exercise of the power granted by this statute indiscriminately indorse foreign medical licenses. The Legislature has provided a way for these applicants to practice medicine. It was never intended that they should be allowed to enter by indorsement. Before the Regents can legally indorse a foreign license they should be satisfied that the applicant has substantially met all requirements. The Regents may not legally, through the exercise of the remedial power conferred by this section, admit to the profession those who have not met the requirements the Legislature has established. If they err at all, it should be on the side of the protection of the public from unworthy and inefficient practitioners. This section was only intended by the Legislature to apply to exceptional cases where the merit of the applicant is clearly established *to the satisfaction of the Regents*. The burden of proof is upon the applicant. He must not only prove that he graduated from certain institutions but he must also prove to the satisfaction of the Regents that these institutions are substantially the equivalent of the New York schools. He must not only prove that he has a foreign license but he must also prove to the satisfaction of the Regents that the requirements for that license were substantially the same as in New York.

Section 1256 of the Education Law prescribes a way for foreign practitioners to enter the practice of medicine in this State. Any person who has the preliminary general education required by the rules of the department and who has completed not less than four satisfactory courses of at least eight months each in a medical school in a foreign country maintaining a standard not lower than that prescribed for medical schools in this State may take the licensing examination.

The only provision for the *indorsement* of a foreign license to practice medicine in this State is found in section 1259 of the Education Law which reads: " The Commissioner of Education may in his discretion on the approval of the Board of Regents indorse a license or diploma of a physician from another State, or country, provided the applicant has met all the preliminary and professional qualifications required for earning a license on exam-

ination in this State, has been in reputable practice for a period of ten years, and has reached a position of conceded eminence and authority in his profession."

If the contention of the petitioners is sound, this provision would be nullified because many persons who are unable to meet the requirements of this provision would be, according to petitioners' contention, amply able to meet the requirements for indorsement found in subdivision 3 of section 51, which is under consideration.

Petitioners strenuously insist that they possess the qualifications necessary to obtain a license to practice medicine in this State. The answer to that argument is that they have failed to sustain that contention.

The Education Law (§ 1250, subd. 6) gives the following definition of a medical school: "'Medical school' means any medical school, college or department of a university, registered heretofore by the Regents or hereafter by the department as maintaining a proper medical standard and as legally incorporated."

Let us now turn to the record bearing on the qualifications of the petitioners.

In the Erlanger petition it is asserted that he began the study of medicine in 1912 and continued it at various German universities until October, 1914. It is alleged that he continued his studies after the war and received his diploma and German medical license in July, 1922.

In the Levi petition it is alleged that at the beginning of the World war he had completed sufficient medical courses in German universities to serve as an assistant physician and that he did serve as such in various hospitals until the end of the war and that he received his medical license on June 10, 1919.

None of the institutions from which the petitioners graduated has ever been registered by the Regents or by the Department of Education as maintaining proper medical standards. In neither petition is there any allegation that the German standards at the time the petitioners received their licenses were substantially the same as those existing in the State of New York. There is no proof whatever as to the equality of the German institution, including faculty, length of courses of study, curriculum or equipment. There is no proof that petitioners ever passed a licensing examination as required in this State. As a matter of fact, what little evidence there is before the Regents indicates that the standard of the German schools was lower than the standards in the State of New York and the requirements for the license were far from being essentially the same as those in New York.

In their brief petitioners stress the point that many other German doctors have been admitted to practice medicine in this State by

the Regents since 1917 by the indorsement of their certificates. That point is without merit. What the Regents may have done in the past is entirely immaterial. We are concerned only with their action in the cases before us.

On September 21, 1936, the Regents adopted a rule to the effect that after October 15, 1936, no license issued by a board of examiners in any foreign country would be indorsed until the applicant passed the licensing examination prescribed by law. Petitioners assert, and the dissenting opinion emphasizes that argument, that in rejecting their applications the Regents acted under this rule. An examination of the record clearly demonstrates that such is not the fact. The answers clearly show that the decision was not based on that ground. The determination was made solely on the theory that petitioners failed to present satisfactory evidence to warrant the indorsement of their licenses. On this appeal the Regents are not seeking to sustain the validity of that rule nor are we relying on it as a basis for our decision. We may assume for the purpose of the argument that the Board of Regents transcended its powers in the adoption of such a resolution.

It cannot be seriously argued that the Board of Regents acted either arbitrarily or capriciously in requiring petitioners to pass a satisfactory examination before indorsing their licenses. The State has the right to demand that those who seek to practice medicine and surgery or to diagnose and treat human diseases, ailments or deformities shall pass a satisfactory examination as evidence of skill and competency. Such a requirement is neither unreasonable nor discriminatory. Surely the best method to determine the skill and ability of an applicant is by direct examination. The relation of physician and patient is of such a confidential and serious nature that not only the skill but also the moral character of the physician is of great importance to the interests of the patient and the State. The object sought in requiring applicants to practice medicine to submit to examination is the protection of the home of the sick and distressed from the intrusion therein in a professional character of those destitute of the proper qualifications. The preservation of public health is one of the duties devolving upon the State as the sovereign power and the discharge of this duty is accomplished by means of the exercise of the inherent police power of the sovereign. We know from our own experience that practically all persons are obliged to consult a physician at some period of life and but few are able to judge of his qualifications in point of learning and skill and because of the importance of the interests committed to his care involving life and death it is imperative that the State should be vigilant in passing upon his qualifica-

tions. The field should only be open to those who possess the prescribed requirements. No one has a vested right to practice medicine free from State regulation and control. The right of a person to practice medicine is subject to the paramount power of the State to impose such regulations within the limitations of the Constitution as may be required to protect the people from ignorance, incapacity, deception or fraud in the practice of that profession.

It is argued that it is unfair to expect that a practicing physician should be able to pass a technical examination. We appreciate that there are physicians of standing in every community who perhaps might not be able to make ready answers with the same glibness as a tyro fresh from his books. Unquestionably, however, an examination would readily disclose a comprehensive knowledge of the fundamentals on their part. The results which petitioners attained in their examinations clearly spell inferiority and incompetency in the profession. A statute requiring itinerant physicians to submit to examination is justified by every consideration of public policy. Physicians who have no fixed place of business, who are unknown to those to whom they tender their services and medicine and who have no reputations for professional skill, honesty and fair dealing to maintain, should not be free to travel about the State in order to prey upon the fears and hopes of the afflicted and the unfortunate. The solicitation of patients by such physicians certainly is harmful to any community because of the opportunity it gives to them to discover ailments where none exist.

To sustain the contention of petitioners would mean that any foreigner who can speak our language and who has been licensed to practice in a foreign country and who actually practiced there for a period of five years could, upon the moment of his arrival at the port of New York, demand the issuance of a license to him to practice his profession in this State. Surely that was never the intent of the Legislature. Our own citizens must pursue a rigorous course of study and supply evidence of good character in order to practice medicine (Education Law, §§ 1256, 1257), and yet, if petitioners are correct, any foreigner who was authorized to practice medicine in his native land can come into the State of New York and be immune from such requirements.

There is not the slightest bit of proof before us which would indicate that the action of the Board of Regents constitutes an unlawful and arbitrary exercise of power. We may not substitute our judgment for that of the Regents in order to determine that their action was unreasonable. The proof before us indicates that the determination of the Board of Regents was not only correct but entirely justified.

The rule is firmly established that the judiciary will not interfere with executive officers in the performance of duties which are discretionary in their nature or involve the exercise of judgment. In the statute under consideration the law reposes discretion in the Regents and not in the courts. We may not say on the record presented to us that the members of the Board of Regents have abused that discretion or that their action is arbitrary, unfair or capricious. Certainly petitioners, on whom the burden rests, have utterly failed to submit proof to that effect. The courts may not control the discretion of the Board of Regents. (*People ex rel. Harris* v. *Commissioners of Land Office*, 149 N. Y. 31; *People ex rel. Wooster* v. *Maher*, 141 id. 337; *Matter of Hamburger* v. *Board of Estimate*, 109 App. Div. 428; *Matter of DeLuca* v. *Byrne*, 168 Misc. 841; affd., 256 App. Div. 859.)

The orders appealed from should be reversed, with fifty dollars costs and disbursements as in one proceeding and the applications denied, with fifty dollars costs as of one motion.

McNamee, Crapser and Bliss, JJ., concur; Hill, P. J., dissents in an opinion in *Matter of Levi*.

Hill, P. J. (dissenting in *Matter of Levi*). Petitioner sought to review a determination made by the Regents of the University of the State of New York, denying his application under the Education Law (§ 51, subd. 3) to have his German medical license indorsed to permit him to practice his profession in this State. The Regents may so indorse a medical license (Education Law, *supra*) issued by a legally constituted board of examiners of any foreign country upon satisfactory evidence that the requirements of that country for the issuance of a license were substantially equivalent to the requirements in force in this State when the foreign license was issued, upon proof that the applicant has practiced his profession in a lawful and reputable manner for not less than five years.

Petitioner made the application to review under article 78 of the Civil Practice Act (§ 1284, subd. 2) by presenting his petition to the Albany Special Term of the Supreme Court. The Regents filed an answer containing a so-called return. The court determined that issues of fact were raised which should be tried, and made an order, which it deemed was required by section 1295 of the Civil Practice Act, that a trial be had to determine whether or not the requirements made by the board of examiners in Germany at the time petitioner's license was issued, were substantially equivalent to those in force in this State at that time, and whether petitioner had engaged in the practice of his profession, as required by the Education Law (§ 51, subd. 3), for five years. Both the petitioner and the respondents appeal from the order.

Respondents plead in their answer that the application was denied under a " policy " established by them October 13, 1933, to refuse indorsement to any applicant who had previously failed in the " professional licensing examination and that such policy has been followed by the department, without exception, since that date," and further, that the application was denied under a " rule " which the Regents had adopted September 21, 1936, concerning applications made after October fifteenth of that year, that " no license issued by a legally constituted board of examiners in any foreign country shall be indorsed, pursuant to the provisions of section 51 of the Education Law, unless the applicant shall pass the licensing examination prescribed by law or Regents' rule."

I quote the relevant language of the statute to aid in determining whether the Regents were permitted to adopt and enforce the " policy " and the " rule " which they invoked in deciding this case: " And the Regents shall have further power to indorse a license issued by a legally constituted board of examiners in any other State or country upon satisfactory evidence that the requirements for the issuance of such license were substantially the equivalent of the requirements in force in this State when such license was issued, and that the applicant had been in the lawful and reputable practice of his profession for a period of not less than five years prior to his making application for such indorsement." (Education Law, § 51, subd. 3.) Under a statute so phrased, may the Regents make further requirements as outlined in their " policy " and " rule " as conditions precedent to the indorsement? They may not make laws; that is a legislative function. When the Legislature by statute has delegated power to them and prescribed a standard under which they may exercise the delegated power, they may make rules in conformity therewith. (*United States* v. *Grimaud*, 220 U. S. 506, 517; *People* v. *Klinck Packing Co.*, 214 N. Y. 121, 139; *Brown* v. *University of State of New York*, 242 App. Div. 85; affd., 266 N. Y. 598.) The standard here is, (1) that the requirements of the foreign country must have been substantially equivalent to those of this State as of the date of the foreign license, and (2) the lawful and reputable practice of medicine by the applicant for at least five years. The Regents' " rule " and " policy " overreach, and do not comply with, the standard fixed by the Legislature. The adoption and attempted enforcement was an *ultra vires* act and supererogation. Further, the decision by the Regents was a final order conclusively determining substantial rights of the petitioner, which may not be made pursuant to self-made *ultra vires* policies and rules, or without a hearing. (*Matter of Sperduto* v. *N. Y. City Inter. R. Co.*, 226 N. Y. 73.)

When the Special Term made the order appealed from, it erroneously applied section 1295 of the Civil Practice Act upon the assumption that issues of fact which the court had jurisdiction to try were presented by the pleadings. The issues of fact are to be determined by the Regents. The language of this section of the Education Law contemplates that hearings will be had, as the determination is to be made " upon satisfactory evidence." A hearing of a kind was held, although petitioner was not notified. The answer states that there was a hearing and decision " as part of this return of all acts and proceedings on the application of said Dr. Julius Levi * * * defendants submit herewith the following summary of the exhibits heretofore mentioned." In this summary is listed letters, affidavits, certificates, notifications and like documents. Under such conditions, a paragraph of section 1296 of the Civil Practice Act applies, " Where the determination under review was made as a result of a hearing held, and at which evidence was taken, pursuant to statutory direction, the following questions shall also be determined." These are numbered 6 and 7 and deal with the sufficiency of proof to sustain the decision made by the administrative board. Under a subsequent paragraph of the same section the Special Term is to determine the issues under the first five paragraphs. As to the issues mentioned in paragraphs 6 and 7 (supra) it is enacted, " Where one of the other two issues [6 and 7] is raised, the court [the Special Term] shall make an order directing that the proceedings be transferred for disposition to a term of the Appellate Division held within the judicial department embracing the county in which the proceeding is instituted." Thereunder the determination of an administrative board is final except for the limited review provided by these two paragraphs.

The Special Term should have disposed of this matter by annulling the determination made by the Regents under the authority given by the 5th numbered paragraph of section 1296, whereunder the Special Term is to decide " Whether, in making the determination, any rule of law affecting the rights of the parties thereto has been violated to the prejudice of the petitioner." The determination of the issues mentioned in the first five paragraphs of section 1296 is to be made by the Special Term. The Regents violated rules of law to petitioner's prejudice by deciding the cause in conformity with the *ultra vires* " policy " and " rule " adopted by them and by failing to determine the issues framed by the Legislature.

Now that this matter is before the Appellate Division, another portion of section 1296 applies. We are to treat the cause, even if it comes before us erroneously, " as if the proper proceedings had been taken," and we are to " dispose of the issues * * * or if the

papers * * * are not sufficient therefor * * * remit the proceeding to the proper term or court to be disposed of." Thereunder, the determination of the Board of Regents should be annulled, because of the errors earlier pointed out.

The background of the Regents' new policy and rule is, of course, the great influx of " non-Aryan " German physicians who have recently come to this country to escape persecution in Germany. The wisdom of changing the policy to meet changed conditions is for the Legislature, not the Regents. The former enacts statutes governing admission to the practice of medicine in this State, and determines what recognition will be given the licenses of those taught in foreign States and countries, and when it has set a standard, the Regents thereunder, and in conformity therewith, may exercise powers delegated to them, and in the exercise thereof may make rules, but may not change or modify the act of the Legislature by establishing new governmental policies. Their answer pleads the petitioner failed to pass the " medical licensing examination." This is not material, as the statute does not require that he shall. Should we apply natural justice rather than this statute, the standard set by the Legislature seems wiser than the Regents' new policy, as the best of American-born physicians five years out of medical school would probably be confounded by the questions prepared for the graduate fresh from the hands of the professors.

Reference is made to section 1259 of the Education Law. That section has no application, and the Board of Regents did not purport to act thereunder, as their " rule " of September 21, 1936, specifically mentions section 51 of the Education Law, and the return contained in the answer refers to " the application of said Dr. Julius Levi, for the indorsement of his German medical license as a license to practice medicine in the State of New York pursuant to section 51 of the Education Law."

I favor the reversal of the order appealed from, with fifty dollars costs and disbursements, and an annulment of the determination made by the Board of Regents, with fifty dollars costs to petitioner.

Orders appealed from reversed on the law and facts, with fifty dollars costs and disbursements, as in one proceeding, and applications denied, with fifty dollars costs, as of one motion.