In the Matter of the Application of OTTO MARBURG, Petitioner, for an Order against ERNEST E. COLE, Commissioner of Education of the State of New York, and GRANT C. MADILL and Others, Regents of the University of the State of New York, Respondents.*

Supreme Court, Special Term, Albany County, November 18, 1940.

---

* Modfd. and affd., 261 App. Div. 324.

*Feinberg & Jerry*, for the petitioner.

*Charles A. Brind, Jr.*, for the respondents.

SCHIRICK, J. This is an application, pursuant to article 78 of the Civil Practice Act, for an order directing the respondents to indorse the petitioner's Austrian medical license, or, in the alternative, for an order transferring the proceedings to the Appellate Division, Third Department, as provided by section 1296 of the Civil Practice Act.

The relief which is sought is based upon section 1259 of the Education Law, which reads, in part, as follows: "The Commissioner of Education may in his discretion on the approval of the Board of Regents indorse a license or diploma of a physician from another State, or country, provided the applicant has met all the preliminary and professional qualifications required for earning a license on examination in this State, has been in reputable practice for a period of ten years, and has reached a position of conceded eminence and authority in his profession."

At the outset the court wishes to state that, in its opinion, this is not a case which comes within the last two subdivisions of section 1296 of the Civil Practice Act There is, therefore, no basis for transferring the proceeding to the Appellate Division. Subdivisions 6 and 7 of this section are preceded by a paragraph which reads as follows: "Where the determination under review was made as the result of a hearing held, and at which evidence was taken, pursuant to statutory direction, the following questions shall also be determined."

Where there has been no hearing at which evidence was taken, or where such hearing has been held without statutory direction, subdivisions 6 and 7 do not apply. (*Matter of Doherty* v. *McElli-*

*gott,* 258 App. Div. 257; *Matter of Brennen* v. *Bruckman,* 253 id. 607; *Matter of Hagen* v. *Picard,* 171 Misc. 475; *Matter of Breen* v. *Picard,* 167 id. 561.) The distinctions heretofore existing between certiorari to review, mandamus, and prohibition are now non-existent. (Civ. Prac. Act, § 1283.) Except as provided in section 1296 of the Civil Practice Act, this court has the power to grant all relief which has hitherto been obtainable under any of the three classifications. This application must, therefore, be decided in the first instance by the Special Term.

Section 1259 of the Education Law vests discretion in the Commissioner of Education and the Board of Regents to indorse a foreign license where certain conditions have been met. It is properly urged by the respondents, and not seriously disputed by the petitioner, that this court cannot, upon this proceeding, interfere with an exercise of discretion conferred by statute. The cases cited by the respondents amply bear out this rule. (*Matter of Levi* v. *Regents of University of State,* 256 App. Div. 444; affd., 281 N. Y. 627; *People ex rel. Rota* v. *Baker,* 136 App. Div. 7; *People ex rel. Schwab* v. *Grant,* 126 N. Y. 473; *People ex rel. Goldenkoff* v. *Albany Law School,* 198 App. Div. 460; *People ex rel. Peixotto* v. *Bd. of Education,* 212 N. Y. 463; *Matter of Davis* v. *Sexton,* 211 App. 233.)

This proceeding may be maintained only to compel compliance with the statute or to prevent action so arbitrary and capricious as to amount to an abuse of discretion. The cases cited by the respondents concede the latter proposition. In *Matter of Levi* v. *Regents of University of State (supra)* the court stated: " It cannot be seriously argued that the Board of Regents acted arbitrarily or capriciously in requiring petitioners to pass a satisfactory examination before indorsing their licenses " (p. 449). " There is not the slightest bit of proof before us which would indicate that the action of the Board of Regents constitutes an unlawful and arbitrary exercise of power " (p. 450). " We may not say on the record presented to us that the members of the Board of Regents have abused that discretion or that their action is arbitrary, unfair or capricious. Certainly petitioners, on whom the burden rests, have utterly failed to submit proof to that effect " (p. 451).

In *People ex rel. Rota* v. *Baker (supra)* the court stated: " This rule [that discretionary powers are not controlled by mandamus] is varied only when the action of the board or person vested with the power of issuing a license is arbitrary, tyrannical or unreasonable, or is based upon false information " (p. 8).

Similar quotations can be obtained from most of the cases. The rule is firmly established that the courts will grant relief against

arbitrary and capricious actions on the part of administrative tribunals.

The issues to which, therefore, the court must confine itself are these:

(1) Is the action of the respondents authorized by law?

(2) Is it a reasonable exercise of discretion, or is it, on the other hand, arbitrary and without foundation in the policy established by the statute?

The statute grants to the Commissioner of Education and the Board of Regents discretion to indorse a foreign license " provided the applicant has met all the preliminary and professional qualifications required for earning a license on examination in this State, has been in reputable practice for a period of ten years, and has reached a position of conceded eminence and authority in his profession." This discretion was conferred upon the respondents for the benefit of the individuals who might come within the provisions of the section. While the language of the section is permissive in form, the law holds it mandatory where the act authorized to be done concerns the rights of an individual. (*People ex rel. Doscher* v. *Sisson*, 222 N. Y. 387, 395; *People ex rel. Comstock* v. *Mayor*, 59 Hun, 258; affd., 128 N. Y. 632.) In other words, respondents must exercise the discretion conferred upon them by section 1259 of the Education Law. They cannot, by rule or practice established for their convenience or considered policy, abdicate this discretionary power. To do so amounts to a repeal of the statutory provision.

It follows from what has been stated that the determination of the Commissioner and Board of Regents cannot be sustained merely by appealing to policy or convenience. The Board cannot make a hard and fast rule denying all such applications and compelling all to submit to an examination. It may be that the occasional indorsement of a license would cause the Board of Regents to be flooded with hundreds of applications. It may be that this would over-burden the Board with the labor involved in the minute examination of each application upon its merits. That, however, is a burden imposed by the statute. Relief must be sought, if at all, in the repeal of section 1259.

The discretionary power, then, cannot be abdicated by the respondents. How is it to be exercised? Clearly, it must be governed by fixed rules and standards. Personal reasons, finding no foundation in the words or policy of the statute, may not be interposed to affect the decision. (*People ex rel. Hultman* v. *Gilchrist*, 114 Misc. 651; affd., 196 App. Div. 964; affd., 232 N. Y. 598.) The statute contains within it all the factors to be considered

in the exercise of discretion by the Commissioner of Education and the Board of Regents. Recourse cannot be had to extrinsic considerations. These factors are:

(1) The possession of all the preliminary and professional qualifications required for earning a license on examination in this State.

(2) Ten years' reputable practice of medicine, and

(3) The attainment of a position of conceded eminence and authority in the profession.

There is no issue presented upon this application as to the first two requirements. The respondents' answer, paragraph fourteenth, makes it clear that they seek to support their determination upon the ground that the petitioner has failed to comply with the third condition. Their position is that he has not reached such position of conceded eminence and authority in his profession as would warrant an indorsement of his license.

The record discloses the following facts as to the petitioner's position in the medical profession:

Dr. Marburg attended the University of Vienna Medical School from 1894 to 1899. He graduated in the latter year, and received a license to practice medicine in Austria. Since his graduation he has held the following positions:

1900–1903. Assistant, Neurological Institute of Vienna University.

1904. Student in Berlin; recipient of Bamberg prize, doing clinical work under Oppenheim and physiological work under H. Munk.

1903–1905. Assistant physician, Neurology and Psychiatric Clinic, Vienna.

1905–1938. Privatdozent for neurology, Vienna University.

1906–1919. Assistant, Neurological Institute of Vienna.

1912–1916. Titular professor, University of Vienna.

1917–1938. Full professor and member of the board of professors of University of Vienna.

1919–1938. Director, Neurological Institute of Vienna University.

January 1, 1939. Clinical professor of neurology, Columbia University; research neuropathologist, Montefiore Hospital, New York city.

As director of the Neurological Institute of Vienna, Dr. Marburg guided the post-graduate studies of many physicians who have since become the most eminent in the field of neurology in the United States. He has written and edited numerous monographs, articles, books and cyclopedias upon the subject of neurology. A

list of these, Exhibit " H," contains 197 separate items. He has published a text book on the anatomy of the nervous system which is used by the leading neurological institutes in the United States. Since his arrival in the United States he has contributed frequently to medical journals. He is a member of the leading neurological societies, here and abroad.

Annexed to the petition are letters of recommendation from the most eminent neurologists of our day. Several will be quoted, giving the tenor of all.

From the letter of Dr. Foster Kennedy, professor of neurology, Cornell University Medical College, and director of the Department of Neurology, Bellevue Hospital: "* * * His name has been one of the most important in European Medicine throughout most of my professional life. I have constantly been educated by his writings even in my student days. * * * I know of no greater figure in the Medical World, and hope the authorities of the Board of Education can endorse medical license for him."

From the letter of Dr. Bernard Sachs, consulting neurologist, New York city:

" * * * I visited him many times in Vienna and met him also in Bern and London at the time of the International Neurological Congresses. In both these Congresses, he held important positions.

" Furthermore, I had occasion to see Doctor Marburg at work in his Institute in Vienna, and can state very definitely that everyone regarded him as the leading Neuropathologist in Europe. In Vienna, I also happen to know, he was the great Consulting Neurologist, and people flocked to him from every country in Europe.

" He has a larger number of pupils, now eminent in this Country, than any other one person in any country. I am fully persuaded that he is a distinct and great asset to the Neurological Profession in this Country. His prominence in Neurological ranks has been attested by the fact that shortly after his arrival here he was made Professor of Neuropathology at Columbia, and was also appointed Neuropathologist both at Mount Sinai Hospital and the Montefiore Hospital."

From the letter of Joshua Rosett, professor of neurology, Columbia University, and scientific director, Brain Research Foundation, New York city: " Dr. Otto Marburg had been for many years the director of the Neurological Institute at Vienna, Austria. Almost every neurologist the world over, of the present generation, studied under him at one time or another, and certainly every neurologist is acquanited with his work. He is the author of numerous books on medical subjects and has been for a great number of years a

contributor to medical journals. He is an honorary member of national medical associations in a number of countries and he has fully deserved the respect of the world wide profession which he has."

Attached to the supplemental petition are four letters from the late Dr. Harvey Cushing of Yale, of world-wide renown as brain surgeon. These distinctly show the high regard with which the petitioner was held by Dr. Cushing.

In view of such record, and such evidence, submitted to the respondents, the court is unable to ascertain any comprehensible ground for denying indorsement of his license. Surely, those most competent to judge the " conceded eminence " of the petitioner are the leading members of the medical profession. The outstanding men in the specialized field of neurology have certified to the petitioner's high rank. More superlative terms can scarcely be composed than those which they have used to describe the petitioner's attainments. Equally eloquent is the circumstance that within a few months of his arrival in the United States he was appointed to the position of clinical professor of neurology at Columbia University.

The court has reached the conclusion that the determination here attacked finds no support in the record, and is, as to this petitioner, arbitrary and unreasonable.

The application is granted.