In the Matter of OTTO MARBURG, Petitioner, Respondent, against ERNEST E. COLE, Commissioner of Education of the State of New York, and GRANT C. MADILL and Others, Regents of the University of the State of New York, Respondents, Appellants, for a Review of the Determination of FRANK P. GRAVES, as Commissioner of Education, and Said BOARD OF REGENTS in the Matter of the Petition of OTTO MARBURG for an Indorsement under Section 1259 of the New York Education Law of His Austrian Medical License.*

Third Department, March 5, 1941.

*Charles A. Brind, Jr.* [*Joseph Lipsky* of counsel], for the appellants.

*Feinberg & Jerry* [*Benj. F. Feinberg* of counsel], for the respondent.

HILL, P. J. The holder of a physician's license or diploma issued in another State or country, who before the granting met all the preliminary and professional qualifications required for earning a license on examination in this State and who thereafter was in reputable practice for ten years, and " has reached a position of conceded eminence and authority in his profession," is entitled to have the Commissioner of Education on the approval of the

---

* Modfg. and affg. 175 Misc. 308.

Board of Regents, indorse the license or diploma, to permit him to practice his profession in the State of New York. (Education Law, § 1259.)

I agree with the justice presiding at the Special Term that the refusal by the Commissioner of Education and the Board of Regents to approve and indorse the Austrian medical diploma or license of Otto Marburg was arbitrary and unreasonable. The Legislature, under its broad grant of power, established the standard for this indorsement, that an applicant must have reached a position of conceded eminence and authority in his profession. It grants to the Board of Regents and the Commissioner of Education discretion to determine whether an applicant is eminent and an authority, but not to select favorites from among those who are concededly eminent and regarded as authorities. If an applicant is concededly eminent and an authority in the medical field, the indorsement is not discretionary.

Petitioner's application was indorsed by many of the most distinguished and famous American physicians working in the field of neurology. The names of some of these are stated in the opinion in the court below. Quoting very briefly from a few of the letters: " I had occasion to see Dr. Marburg at work in his Institute in Vienna, and can state very definitely that everyone regarded him as the leading neuropathologist of Europe. In Vienna, I also happen to know, he was the great consulting neurologist and people flocked to him from every country of Europe; " " Dr. Marburg was Director of the Neurological Institute at Vienna before he was forced to come to this country by the political situation in Austria. As Director of the Institute, he was the head of the best known and most widely attended clinic and laboratory for post-graduate instruction in neurology in Europe. * * * He is one of the most eminent scientists who have been added to our academic circles; " " Dr. Marburg, owing to political events in Europe, is now in New York, where his great learning and experience can be used for the benefit of American medicine. I know of no greater figure in the medical world, and hope the authorities of the Board of Education can endorse medical license for him."

The record fails to disclose any who hold opinions opposite to those quoted. The arguments advanced by the attorney on behalf of the appellants are not convincing. It is said, in substance, that Dr. Marburg's fame and eminence are limited to one branch of medicine — neurology; that the Regents require eminence as general practitioners. This does not seem to accord with recognized authorities on medical history. I quote from the Encyclopædia Britannica (Vol. 15 [14th ed.], p. 205): " The system of medical

specialization so characteristic of our age, though begun in England, spread to the Continent and affected no school more profoundly than that at Vienna. This seat of learning was long the main place of pilgrimage for English-speaking medical men who desired to continue their studies abroad." Quoting from the same volume (p. 197): "Neurology. The physiology and pathology of the nervous system has steadily progressed; the researches into the factors presiding over equilibrium and posture have yielded valuable information; * * *."

No argument is required to convince even a layman of adult years of the effect of a nervous disorder upon all physical functions. A further argument advanced for the reversal of this order is that the indorsement of the certificate would affect adversely the fortunes and privileges of the medical profession of this State because, as the brief states, " Our own citizens are required to spend money and time to secure a complete background of elementary and academic education and long periods in colleges devoted to obtaining technical knowledge concerning the profession." The statutes concerning the licensing of physicians are not intended to be for the benefit of the members of that guild, but to advance and promote the public welfare through the improvement of the health of our citizens. Except for the latter consideration, it would be in violation of our Constitution to grant to a limited number of persons the privilege to treat human ills in return for very adequate compensation. With complete unanimity the imposing array of medical experts who have spoken in connection with this matter say, in substance, that the public health will be benefited by permitting this famous man to practice in the State of New York.

The Board of Regents and the Commissioner of Education may not disregard uncontroverted evidence. (*Matter of Guernsey Breeders Co-op.* v. *Noyes,* 284 N. Y. 197.)

I vote to affirm the order of the Special Term.

BLISS, SCHENCK and FOSTER, JJ., concur; concurring opinion by SCHENCK, J., in which HILL, P. J., BLISS and FOSTER, JJ., concur; HEFFERNAN, J., dissents, in an opinion.

SCHENCK, J. (concurring). Appeal from an order of the Supreme Court, entered in Albany county clerk's office November 26, 1940, granting petitioner's application, in a proceeding under article 78 of the Civil Practice Act, for an order directing appellants to indorse respondent's Austrian medical license, pursuant to section 1259 of the Education Law.

Respondent, the petitioner herein, born in Czechoslovakia in 1874, graduated from a gymnasium after nine years' attendance,

following which he attended for five years the University of Vienna Medical School, from which he graduated in 1899, receiving in the same year his license to practice, in Austria, medicine, surgery, ophthalmology and gynecology. He was in active practice in Vienna from 1905 to 1938, during which period he published about two hundred scientific papers and books, listed through some twenty pages of the printed record, edited several encyclopedia on medicine and was accorded membership in leading neurological societies of the world, including the American Neurological Society, to which he was elected as an honorary member in 1932. From 1919 to 1938 he was director of (not merely " connected with ") the Neurological Institute at the University of Vienna where, as head of the best known and most widely attended European clinic and laboratory for post-graduate instruction in neurology, he conducted courses of instruction for students who flocked to him from every country of Europe, besides hundreds of Americans.

As a refugee from Austria he entered this country in June, 1938, and some three months later he filed his declaration of intention to become an American citizen. In January, 1939, he was appointed Clinical Professor of Neurology at Columbia University and became Research Neuropathologist at the Montefiore Hospital, where his laboratory work was supported by grants from the Rockefeller and the Friedsam Foundations. In August, 1939, the State Education Department advised him that he had passed, in the preceding June, his examination in English for foreigners.

To enable him to practice his profession in this State three alternatives were open to respondent under the provisions of the Education Law: (a) under subdivision 3 of section 51, by obtaining from the Board of Regents of the University of the State of New York an indorsement of his foreign license " upon satisfactory evidence that the requirements for the issuance of such license were substantially the equivalent of the requirements in force in this State when such license was issued, and that the applicant has been in the lawful and reputable practice of his profession for a period of not less than five years prior to his making application for such endorsement; " (b) under subdivisions 3 and 4 of section 1256, by taking a licensing examination which is open to an applicant who has " the preliminary general education required by the rules of the Department," and who " has completed not less than four satisfactory courses of at least eight months each in a medical school * * * in a foreign country maintaining a standard not lower than that prescribed for medical schools in this State; " (c) under section 1259, " The Commissioner of Education may in his discretion on the approval of the Board of Regents indorse a

license or diploma of a physician from another State, or country, provided the applicant has met all the preliminary and professional qualifications required for earning a license on examination in this State, has been in reputable practice for a period of ten years, and has reached a position of conceded eminence and authority in his profession."

On February 28, 1939, respondent addressed to the Board of Regents an informal letter requesting grant of a license without examination and inclosing therewith what he termed his *curriculum vitæ* and a testimonial signed by four doctors. Under date of March 7, 1939, the Regents' receipt of the application was acknowledged, a formal application blank was inclosed and respondent was advised that he must submit evidence of having declared his intention to become a citizen of the United States and must pass the examination in English prescribed for foreigners. On September 12, 1939, respondent informed the Regents that he had obtained his first citizenship papers on September third of the year before and that he had passed his examination in English for foreigners in June, 1939. Further documents were required of respondent in a letter from the Regents bearing date September 20, 1939, an application fee of twenty-five dollars was exacted (apparently under the mistaken impression that respondent was applying under section 1256) and the letter closed with the ominous warning that " I cannot hold out any hope that the application for indorsement will be granted." Further supporting documents having been filed with the Regents from time to time in the interval, an Associate Commissioner of Education advised respondent, under date of November 20, 1939: " It is my personal opinion that it would be unwise for you to endeavor to secure the indorsement of your Austrian medical license on the ground of special eminence and authority because of the settled policy of the Board of Regents not to approve such applications except in very unusual and extraordinary cases. In your case, while your pre-eminence in the field of medicine might be readily established, there are many others in the profession who could claim equal consideration and I am certain that the Regents would not be inclined to act favorably in your case."

Electing, however, to proceed under section 1259, respondent, on January 23, 1940, submitted to the then Commissioner of Education and to the Board of Regents his formal petition for an indorsement of his Austrian medical license upon the following grounds: (a) That he had theretofore met all the preliminary and professional qualifications required for earning a license on examination in the State of New York; (b) that he had been in

reputable practice for a period of over thirty years; and (c) that he had reached a position of conceded eminence and authority in his profession, particularly in the field of neurology, and that he had done a great deal to further advance the practice of the science of medicine. Such petition was accompanied by various supporting documents required by the Regents, including testimonials from six eminent doctors, supplied in compliance with the Regents' suggestion that " you, submit as many letters and certificates as you can obtain from outstanding physicians in this country indicating their belief, if such is the case, that you should be granted a license to practice medicine upon the basis mentioned." On March 14, 1940, the Regents' Committee on Licenses met in New York city and conducted a hearing at which respondent and his counsel appeared. In a letter dated five days later petitioner's counsel was advised that " at the recent meeting of the Board of Regents the application of Dr. Otto Marburg, for the indorsement of his Austrian medical license on the ground of eminence and authority in his profession, was denied." Thus no question was made but that respondent has met " all the preliminary and professional qualifications required for earning a license on examination in this State," or that he " has been in reputable practice for a period of ten years."

Acting on a suggestion from one of the Regents, respondent's counsel, on April 9, 1940, filed with the Board a supplemental petition which, with the original petition and the exhibits accompanying that document, was presented to the Regents on April 19, 1940, when respondent's application for indorsement of his Austrian medical diploma was again denied, the vote of the Regents erroneously reciting that respondent's application had been made under section 51. In view of such mistake on the part of the Regents, respondent, directing attention to the fact that he was proceeding not under section 51, but under section 1259, of the Education Law, renewed his application to the Board at a meeting thereof held May 17, 1940, when, again making no question but that respondent had met all of the requisite preliminary and professional qualifications or that he had been for ten years in reputable practice, the Regents voted that respondent's petition and supplemental petition " under the provisions of section 1259 of the Education Law, on the ground of his having reached a position of conceded eminence and authority in his profession, be denied." Within the prescribed statutory time thereafter this proceeding was instituted, resulting in the order now before us for review.

It is conceded that, as Justice HEFFERNAN observes, the single question presented is whether appellants' denial of respondent's

application was arbitrary, unfair or capricious. For the reasons hereinafter set forth it was all three. Arbitrary, because done without adequate determining principle; unfair, because of appellants' obvious determination from the first to close the door against respondent; capricious, because simply a manifestation of appellants' whim. Respondent's vain attempts to obtain the privilege of practicing here were marked not alone by the brusque intimation at the outset that he would probably fail. For the petition alleges, and the answer does not deny, that later occurred a discreditable but abortive effort to entrap respondent into treating a stool-pigeon who had been detailed to seek his ministrations, when compliance on his part would have involved him in the commission of a crime. (Education Law, § 1263.) To similar tactics Mr. Justice HOLMES has applied the epithet " dirty business." (*Olmstead* v. *United States,* 277 U. S. 438, 470.)

Numerous reasons are assigned to justify the treatment accorded respondent by appellants, among them:

1. That appellants thoroughly investigated respondent's record and fully considered his application on the merits.— It is difficult to reconcile a claim of thorough investigation with a denial of the application as having been made under section 51, whereas respondent was proceeding under section 1259, or a consideration on the merits in view of the prejudice obviously held against respondent from the beginning.

2. That appellants have made a non-reviewable choice from opposing inferences adduced from conflicting evidence.— On the contrary, the evidence adduced before appellants all points in the direction of respondent's conspicuous fitness and affords no basis for conflicting inferences which might be drawn by reasonable men.

3. That, save in the four instances where they have made an exception, since 1918, to their otherwise inexorable rule, the Regents have properly established for the State a policy of requiring every foreigner to submit to examination.— But " a State has no public policy except that which is found in its Constitution and laws." (*Bloom* v. *Jewish Board of Guardians,* 261 App. Div. 143, 148.) " Laws are made by the law-making power and not by administrative officers acting solely on their own ideas of sound public policy, however excellent such ideas may be." (*Matter of Picone* v. *Commissioner of Licenses,* 241 N. Y. 157, 162.) Very likely few experienced lawyers, and still fewer judges whose official tenure has removed them for any considerable length of time from the practice of law, would be expected to pass a present-day bar examination paper which, however, a tyro fresh from law school could probably pass with distinction.

4. That respondent's prolific authorship on medical treatises, far from establishing his " position of conceded eminence and authority in his profession," stamps him as one whose efficiency in his field is open to suspicion, and affords a fair inference that his entire professional life has been passed in cloistered security of teaching institutions, wherefore he is not entitled to have his name inscribed upon the permanent rolls of the medical profession.— Within such cynical appraisal must we list such classic law-writers as Greenleaf, Wigmore, Cooley, Dillon, Beale, Jones and Williston? " Each in his separate star " was recognized as having reached a " position of conceded eminence and authority in his profession." Professor Pomeroy has been ranked by Judge VANN with Justice STORY. (*Elterman* v. *Hyman*, 192 N. Y. 113, 122.) Of an author to whom the profession in this State is indebted for standard works on practice, which have become the *vade mecum* of every lawyer, it has been observed by Mr. Justice JENKS: " The research, learning and logic of Austin Abbott make his conclusions valuable to any court." (*Fox* v. *Cowperthwait*, 60 App. Div. 528, 530.) Does Mr. Justice STONE rest under any stigma because, prior to his appointment to the Supreme Court, he was dean of Columbia Law School? Many recent accessions to the Federal judiciary include men who have devoted years to the teaching of law. An outstanding teacher in a medical school is no more withdrawn from human contacts than a judge of an appellate court.

5. That the attendance of countless students, including innumerable Americans, upon respondent's courses at the Vienna university signifies nothing. Emerson, however, declared that if a man could make a better mousetrap than any one else, then, though he should establish himself in the midst of a forest, the world would beat a path to his door.

6. That the impressive array of testimonials from distinguished physicians in this country, certifying to respondent's standing, must have been perfunctorily written, it even being suggested that they are stereotyped in form and " are so discreetly phrased that they convey little, if any, information beyond the good wishes of the writers."— So to evaluate them is simply to close one's eyes to the unqualified assurances given by men in far better position than a group, composed of those who in the medical world are laymen, to appraise accurately respondent's claim to a position of eminence and authority in his profession:

Dr. Bernard Sachs: " I had occasion to see Dr. Marburg at work in his Institute in Vienna, and can state very definitely that everyone regarded him as the leading neuropathologist of Europe. * * * He has a larger number of pupils, now eminent in this

country, than any other one person in any country. I am fully persuaded that he is a distinct and great asset to the Neurological Profession in this country. * * * If any man was deserving of an indorsement of his license to practice, Doctor Marburg surely is. * * *"

Dr. Foster Kennedy: "His name has been one of the most important in European Medicine throughout most of my professional life. I have constantly been educated by his writings, even in my student days. * * * I know of no greater figure in the Medical World, and hope the authorities of the Board of Education can indorse medical license for him."

Dr. Joshua Rosett: "Almost every neurologist the world over, of the present generation, studied under him at one time or another, and certainly every neurologist is acquainted with his work."

Dr. Henry Alsop Riley: "I have known Dr. Marburg for over ten years personally and for my entire professional life by reputation. * * * As Director of the Institute he was the head of the best known and most widely attended clinic and laboratory for postgraduate instruction in neurology in Europe. Hundreds of those in our specialty in this country have been his students. In his professional activity he has combined a thorough, complete and searching knowledge of neurology, neuroanatomy, neuropathology and the therapy of neurological disorders. He is one of the most eminent scientists who have been added to our academic circles."

Dr. E. D. Friedman: "Dr. Marburg was my teacher in Vienna over thirty years ago and has been for many years an outstanding neuroanatomist, neuropathologist and clinician. He was the dean of the neurologists of Austria, presiding officer of their local and national societies, and has made a long series of splendid contributions to the field of neurology."

Dr. Tracy Jackson Putnam: "Professor Marburg is a neurologist of international reputation. * * * His laboratory in Vienna was a well-known training center, where scores of American neurologists have studied. * * * He is famous also as a writer on neurological subjects, and has been asked to contribute to all of the Handbooks of neurology in the German language published during the last generation. I have just seen his latest production, a treatise on the optic tract and its connections with the brain, which is in every way remarkable."

Dr. Willard C. Rappleye: "Dr. Otto Marburg was an eminent neuropathologist in Vienna and one of the outstanding figures in his field in the world. We have been very glad to have him associated with this School since his arrival in this country. * * * It is my own opinion * * * that Dr. Marburg is one of the

few men whom I have personally known in his situation who might be licensed on the basis of his eminence in his special field of medicine."

Besides the foregoing, intimate personal letters from the late Dr. Harvey Cushing, addressed to respondent in Vienna, attest the high regard in which he held respondent's professional attainments.

7. That this court may not, upon the record before it, disturb appellants' determination.—Yet error, as matter of law, may be predicated on an abuse of discretion so flagrant as to shock one's sense of justice.

" An abuse of discretion is an abuse of power, and is therefore, an error of law." (Cohen on Powers of the Court of Appeals, § 135.)

In the words of the present Chief Judge of the Court of Appeals: " Administrative boards, though acting in a quasi-judicial capacity, may employ a yardstick devised by the use of reason and fairness to meet their particular problems. In the review of their determinations, the courts must apply a similar measure." (*People ex rel. Hirschberg* v. *Bd. of Supervisors*, 251 N. Y. 156, 161.)

The limits of reasonable discretion are transgressed where refusal is based upon a ground which is not supported by any evidence, and arbitrary refusal of a license in such a case to a fit and proper applicant is a wrong to him. (*Matter of Small* v. *Moss*, 277 N. Y. 501, 507.) Even the widest discretion cannot justify a determination which is without any reasonable foundation in fact. (*Matter of Small* v. *Moss*, 279 N. Y. 288, 294.)

" In the absence of a clear expression by the Legislature to the contrary, the courts may review the exercise of a discretionary power vested in an administrative officer or body to determine whether the case discloses circumstances which ' leave no possible scope for the reasonable exercise of discretion in such manner.' " (*Matter of Schwab* v. *McElligott*, 282 N. Y. 182, 186.)

Neither of two recent cases which passed through this court precludes us from correcting the injustice worked by appellants' determination. In *Matter of Levi* v. *Regents of University of State* (256 App. Div. 444; affd., 281 N. Y. 627) the applicant proceeded under section 51. So, too, in *Matter of Bailey* v. *Mangan* (261 App. Div. 64), where, it is true, application was made also under section 1259, with whose prescribed preliminary qualifications, however, petitioner had not complied.

The order should be affirmed, with fifty dollars costs and disbursements to respondent.

HILL, P. J., BLISS and FOSTER, JJ., concur.

HEFFERNAN, J. (dissenting). The respondent, Otto Marburg, was born in Romerstadt, Czechoslovakia, on May 25, 1874. He was graduated from the University of Vienna Medical School and licensed to practice medicine in Austria in 1899. He emigrated to the United States in June, 1938, and later filed a declaration of his intention to become a citizen of this country. Prior to his arrival here he was connected with the Neurological Institute of Vienna. Since coming to this country he has secured a position as clinical professor of neurology at Columbia University. Neurology is but one of a great variety of subjects in the vast domain of medicine. He is also engaged in the capacity of research associate at the Montefiore Hospital, New York city. It is unnecessary for him to obtain a medical license in this State for the discharge of the duties of either of these positions.

On January 23, 1940, respondent submitted to appellants, the Commissioner of Education and the Board of Regents, an application for the indorsement of his foreign license, without examination, under the provisions of section 1259 of the Education Law. Accompanying his affidavit and as part thereof he annexed certain documents from abroad certifying to his preliminary and professional qualifications. At the same time he also filed with appellants verified statements as to his practice and experience together with letters from six American doctors who recommended that his application be granted. During the pendency of his application respondent was accorded opportunity to appear before a committee of the Board of Regents. He availed himself of this privilege and he and his counsel were heard orally and the merits of his claim fully considered. Later and on May 17, 1940, appellants denied his application.

Thereafter respondent instituted this proceeding under article 78 of the Civil Practice Act to review such determination. After hearing the parties the Albany Special Term of the Supreme Court annulled the decision of appellants and directed them to indorse respondent's Austrian medical license, thereby opening the door to him to practice his profession in this State without the necessity of submitting to a medical licensing examination. From that order appellants have come to this court.

While the question presented to us primarily concerns only the right of respondent to practice medicine without examination, the real issue involved is one of paramount importance to the people of this State. At common law the practice of medicine was open to all people who desired to practice it, subject to liability for damages for lack of skill on the part of the practitioner and to the right of the government to proceed by quo warranto to prevent

incompetents from following the profession. With the passing of the years in practically all civilized countries laws were enacted requiring every one who proposed to devote himself to the prevention, cure or alleviation of disease and pain to demonstrate that he possessed the requisite knowledge of the nature of disease, its anatomical and physiological features, its causative relation and the preparation and action of drugs. One of the principal functions of government is the protection of the health of the citizen and to that end the Legislature, under the police power, may adopt and enforce reasonable rules and regulations not only to prevent the spread of communicable diseases but also for the cure or alleviation of the sick or injured. It is by reason of its solicitude for the public health and welfare that it has enacted laws requiring a certain standard of learning and training of those who undertake to preserve or repair that most delicate mechanism — the human body.

Today no person has an absolute, unqualified or vested right to practice medicine or surgery. It is a privilege granted upon compliance with certain prescribed conditions and always subordinate to the police power of the State in the protection of the public health against ignorance, incapacity, deception or fraud in the practice of that profession. In order to secure a license to practice the applicant must submit proofs of fitness to administer to the ailments of the afflicted. To earn the coveted degree of doctor of medicine our own citizens must pursue a rigorous course of study, be profuse in the expenditure of time and money in the acquirement of elementary, academic, collegiate and technical education, supply evidence of good character and then pass a licensing examination to establish their fitness. (Education Law, §§ 1256, 1257.)

The statute prescribes three alternative methods of procedure, compliance with any one of which will enable a foreign doctor to obtain a license to practice medicine in this State. Section 1256 of the Education Law prescribes a way for foreign practitioners to enter the practice of medicine in this State. Any person who has the preliminary general education required by the rules of the department and who has completed not less than four satisfactory courses of at least eight months each in a medical school in a foreign country maintaining a standard not lower than that prescribed for medical schools in this State may take the licensing examination. Subdivision 3 of section 51 of the Education Law provides that the Regents shall have power to indorse a medical license issued in any other State or country upon receiving satisfactory evidence that the requirements for the issuance of such license are sub-

stantially the equivalent of the requirements in force in this State when the license was issued and that the applicant has been in the lawful and reputable practice of his profession for a period of not less than five years prior to the application for such indorsement.

Respondent is not seeking a license to practice in this State through either of these routes. His application is to compel appellants to indorse his foreign license under section 1259 of the Education Law, the pertinent provisions of which are: " The Commissioner of Education may in his discretion on the approval of the Board of Regents indorse a license or diploma of a physician from another State, or country, provided the applicant has met all the preliminary and professional qualifications required for earning a license on examination in this State, has been in reputable practice for a period of ten years, and has reached a position of conceded eminence and authority in his profession."

The language of this statute is quite significant. An applicant desiring to have his foreign license indorsed must establish that he possesses the preliminary and professional qualifications necessary to obtain a license as the result of an examination and also that he has been in reputable practice for the statutory time *" and has reached a position of conceded eminence and authority in his profession."* If he satisfies these requirements the statute then provides that the Commissioner of Education *" may in his discretion on the approval of the Board of Regents "* indorse his license.

As we have already shown, a foreign practitioner may be licensed to practice medicine in this State by passing a satisfactory examination as provided in section 1256. He may under certain conditions outlined in section 51 be licensed without examination. Surely it was never the intention of the Legislature in the enactment of section 1259 that it should be used by the Board of Regents as a vehicle for the indiscriminate indorsement of foreign medical licenses, thereby relieving these applicants from all the requirements which we exact from our own citizens. A foreign practitioner seeking a license has no just cause for complaint if placed on an equality with our own people. He ought not, except in very rare instances, to be immune from those requirements which we impose upon our own candidates.

It is obvious that the statute under consideration invests the Commissioner of Education and the Board of Regents with a very wide discretion, with which we have neither the wish nor the power to interfere. It is not for us, where opposing inferences may be drawn, to determine which we shall accept and which reject. It is not for us, where the evidence is conflicting, to determine where lies the truth. The courts will not control the discre-

tion of the Board of Regents, in the absence of clear and convincing proof that it has been arbitrarily, oppressively or capriciously exercised. (*Matter of Levi* v. *Regents of University of State*, 256 App. Div. 444; affd., 281 N. Y. 627.) Much of what we said in the *Levi* case applies with equal force to the facts in this record.

On the record before us our power of review is limited to a consideration of the single question whether the action of the Board of Regents in denying respondent's application was arbitrary, unfair or capricious. The burden of proof is on respondent to establish that contention.

The Commissioner of Education and the Board of Regents have exercised the discretionary power conferred upon them by section 1259 with commendable caution. Since January 1, 1918, but four persons have been licensed under this section, namely, Dr. Bela Schick, the discoverer of the Schick test for determining susceptibility to diphtheria; Dr. Benjamin Philip Watson, outstanding discoveries and services in the field of gynecology; Dr. George Hoyt Whipple, codiscoverer of the cause and cure for pernicious anemia; Dr. Manfred Sakel, the originator of the so-called insulin shock treatment for dementia praecox or schizophrenia. Each of these persons is recognized throughout the world by reason of some unique contribution in the field of medicine; each has attained a position of eminence and authority in the medical profession.

A glance at respondent's record which we are bound to assume appellants thoroughly investigated unhesitatingly discloses that his accomplishments are not at all comparable to any one of the doctors named. True it is that he has an excellent record in Austria as a professor. True it is also that he has written or collaborated in writing many books and brochures. The mere fact that a member of one of the learned professions has written one or more books relating to his calling is no criterion of success; very often it spells inefficiency in the author's field. The books which respondent has written are in native German and are not familiar to members of the medical profession in this country. The record fails to show that any one of these books or papers shows unusual scholarship or makes claim to any discovery in medicine or surgery. Highly significant is the fact that the record contains not the slightest intimation that respondent's teachings or theories have been sanctioned, adopted or followed by other members of the profession. It is not even asserted that he has made any recognized contribution to medical science. Certainly there is nothing in his medical career to justify the conclusion that he has been touched by the magic wand of genius. So far as the proof shows he has done nothing to justify the inscription of his

name on the permanent rolls of the medical profession. Even if we assume that he distinguished himself in his native land in one branch of learning that is not sufficient warrant for his claim to recognition as one who " has reached a position of conceded eminence and authority in his profession " in this country. It is a fair inference from the record that he never has been actively engaged in the practice of medicine but that his entire professional life has been passed in the cloistered security of teaching institutions. This is not a case, as Justice SCHENCK seems to think, where the ability or standing of legal writers is involved. We are passing only on the question of respondent's right to coerce the action of the Board of Regents.

Respondent has emphasized the fact that many physicians now practicing in various States in this country pursued part of their course of study in the institution with which he was connected at Vienna. It is not claimed that these physicians chose that institution because respondent was one of its professors or that because of his instruction they have achieved success in their profession. It is common knowledge that literally thousands of our medical students have studied abroad. That does not warrant licensing their professors in this country on the ground of " conceded eminence and authority." If that were sufficient reason it would open the door of the medical profession to a prodigious influx of European professors.

The letters of recommendation attached to respondent's application commend him highly. They are not under oath and carry no probative value, however. In no one of the letters does there appear a single reason why respondent should be so highly honored by this State. In fact all the letters are so discreetly phrased that they convey little, if any, information, beyond the good wishes of the writers. Then, too, judges know, what every one else knows, how easily letters of recommendation are obtained. In any event we are not specially concerned about the opinions of a few doctors as to respondent's qualifications. We are dealing only with a question involving the discretion of the Board of Regents and not the discretion of some one else.

On the record before us we may not say that the educational authorities of the State have acted unfairly, arbitrarily or capriciously in passing on respondent's application. Certainly there is not a scintilla of evidence to justify such a conclusion. They have not discriminated against him. The Commissioner of Education and the members of the Board of Regents are individuals of probity, integrity and honor. It is hardly fair to attempt to sully their official action by characterizing it as " dirty business."

By contemporaneous construction of the statute in question, as evidenced in the four instances in which licenses have been indorsed, the Commissioner of Education and the Board of Regents have given the words " conceded eminence and authority " used in the statute a definite meaning, one generally acquiesced in by the medical profession. The Regents are simply insisting in this case, as it is their duty to do, that no person shall be licensed to practice medicine on the claim that he has reached a position of conceded eminence and authority unless he has earned a reputation of international repute in his profession and has, by his achievements, clearly demonstrated that he is the possessor of outstanding talent and ability.

The order appealed from should be reversed, on the law and facts and the proceeding dismissed, but under the circumstances, without costs.

Order modified to direct that the proceeding be remitted to the Board of Regents and the Commissioner of Education with instructions that the Commissioner of Education indorse the petitioner's medical license in compliance with section 1259 of the Education Law and that the Board of Regents approve, and as so modified the order is affirmed, with fifty dollars costs and disbursements.